IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

THE SOCIETY OF LLOYD'S,

        Plaintiff,

vs.                                                            CIVIL NO. 02-264 LFG/WWD-ACE

RICHARD A REINHART et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Plaintiff, The Society of Lloyd's, Motion for Summary Judgment Against All Defendants [Doc. 21]. The Court considered Plaintiff's motion, memorandum and exhibits [Doc. 22], together with the Defendants' response and supporting documents [Docs. 31 & 32], and Plaintiff's reply [Docs. 40 & 42]. By prior order, the Court denied Defendants' request to file a surreply [Doc. 43] and request for oral argument [Doc. 45]. This matter may be resolved on the parties' submissions.

### Present Litigation

The scope of this lawsuit is very narrow and only involves the Plaintiff's request that the Court recognize and enforce a money judgment issued in its favor and against the Defendants by a foreign court, specifically, the High Court of Justice, Queen's Bench Division, in London, England. Therefore, this Court's function is limited. It cannot retry issues litigated and laid to rest in the United Kingdom, nor can it substitute its own judgment for that of the foreign tribunal. Rather, its responsibility is to interpret and apply New Mexico's substantive law as outlined in the Uniform Foreign Money-Judgments Recognition Act ("Uniform Act"), NMSA 1978 §§ 39-4B-1 to 39-4B-9.

**Uniform Foreign Money-Judgments Recognition Act**

In 1962, at the recommendation of the American Bar Association, the National Conference of Commissioners on Uniform State Laws approved the codification of the Uniform Foreign Money-Judgments Act. Jay M. Zitter, Annotation, Construction and Application of Uniform Foreign Money-Judgments Recognition Act, 88 ALR 5th 561 (2001). This codification was intended to standardize policies and procedures involved in the recognition and enforcement of foreign money judgments.

> The purpose of the Act is to make it more likely that judgments rendered in a state that adopted the Act will be recognized abroad, since in a large number of civil-law countries, the granting of conclusive effect to money judgments from foreign countries is made dependent on reciprocity.

Id., *citing* the Commissioners' Prefatory Note to the Uniform Act. The intent of the National Conference of Commissioners was that recognition of a foreign judgment by an American court would similarly result in recognition of an American judgment in a foreign court, thus, promoting principles of international comity.

The Uniform Act adopted by the New Mexico Legislature in 1991 simply provides a mechanism for a domestic court to recognize and enforce money judgments issued by a foreign state in the same fashion as the domestic court would recognize and enforce judgments and decrees issued by a sister state under the Constitution's Full Faith and Credit Clause. While federal judicial proceedings are not expressly included within the Full Faith and Credit Clause, Braselton v. Clearfield State Bank, 606 F.2d 285, 287 (10th Cir. 1979), *citing* Davis v. Davis, 305 U.S. 32, 59 S. Ct. 3 (1938), when a federal court hears a diversity action, the Court applies the forum state's substantive law. In the case at bar, New Mexico requires that under certain conditions, full faith and credit be given to foreign judgments. Thus, under the Uniform Act, if the judgment is valid and enforceable

where entered, it is valid and enforceable here in New Mexico and will be recognized and enforced by a federal court sitting in diversity.

New Mexico's Uniform Act applies to any foreign judgment that is final, conclusive and enforceable where rendered. NMSA 1978 § 39-4B-3. The law provides at § 39-4B-4:

> Except as provided in Section 5 [39-4B-5 NMSA 1978] of the Uniform Foreign Money-Judgment Recognition Act, a foreign judgment meeting the requirements of Section 3 of that act is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment is enforceable in the same manner as the judgment of a sister state that is entitled to full faith and credit.

This Court's function is not to second guess the wisdom, prudence, fairness or judgment of a foreign court, but, rather, to determine if the foreign court's judgment is final, conclusive and enforceable where rendered, and to further determine if there exists grounds for non-recognition as set out in Section 5 of the Uniform Act, which provides:

> Grounds for Non-Recognition.
> A. A foreign judgment is not conclusive if:
> (1) the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
> (2) the foreign court did not have personal jurisdiction over the defendant; or
> (3) the foreign court did not have jurisdiction over the subject matter.
>
> B. A foreign judgment need not be recognized if:
> (1) the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
> (2) the judgment was obtained by fraud;
> (3) the cause of action on which the judgment is based is repugnant to the public policy of this state;

> (4) the judgment conflicts with another final and conclusive judgment;
> (5) the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or
> (6) in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action.

If this Court finds that the foreign judgment was final, conclusive and enforceable where issued, and if there are no grounds for denying enforcement as set forth in § 39-4B-5, the Court is compelled to recognize and enforce the judgment.

The reasons for this are apparent and in accord with sound public policy. If a judgment debtor was permitted to re-litigate issues that were fairly and fully adjudicated, or otherwise permitted endless collateral attacks on a judgment, there would be no finality of judgments and no certainty as to the outcome of judicial proceedings.

By keeping one legal challenge ahead of a judgment creditor, a judgment debtor could avoid responsibility. Multiple proceedings could result with the potential for inconsistent determinations, leading to a lack of confidence in the judicial process, increased costs and endless delay.

In construing the companion Uniform Foreign Judgments Act, NMSA 1978, § 39-4A-1 through 6,[1] the New Mexico Court of Appeals stated:

> We . . . hold that the New Mexico Foreign Judgments Act does not change the universal rule that foreign judgments are entitled to full faith and credit. Only the defenses of fraud or lack of jurisdiction may be raised to destroy the full faith and credit owed a foreign judgment. [cite omitted]. To interpret the language of our statute otherwise

---

[1] This is a companion statute to the Uniform Foreign Money-Judgments Recognition Act. It differs from the statute involved in this case, as it applies to judgments issued by sister domestic courts not judgments of foreign tribunals.

4

would not afford any finality to foreign judgments and would be contrary to the constitutional mandate.

Jordan v. Hall, 115 N.M. 775, 777, 858 P.2d 863, 865 (Ct. App. 1993).

While the Court of Appeals decision in Jordan v. Hall is based on the companion domestic judgment statute, the applicable court's analysis and rationale are equally applicable here.

### Defendants' Request for Discovery

Defendants assert that Lloyd's motion is premature and that discovery has not yet started, much less been completed. However, the motion is timely under Fed. R. Civ. P. 56(a), as it is submitted after the expiration of twenty days from the commencement of the action and no Rule 56(f) affidavit was filed.

Moreover, Defendants do append affidavits from the Defendants and others in response to the motion. Under these circumstances, the Court rejects Defendants' agreement that the Rule 56 motion is premature and that a ruling should be postponed.

### Undisputed Facts

In support of its motion, Lloyd's submitted a statement of undisputed facts with supporting documentation.[2] While Defendants here dispute the majority of Lloyd's statement of facts, the disputes touch on non-material matters.[3] Suffice to say that while the parties dispute many of the

---

[2] Numerous courts have summarized the facts applicable to the underlying litigation, and these facts are not in dispute. *See* Society of Lloyd's v. Webb, 156 F. Supp. 2d 632 (N.D. Tex. 2001); Society of Lloyd's v. Ashenden, 233 F.3d 473 (7th Cir. 2000); Haynsworth v. The Corporation, 121 F.3d 956, 958-61 (5th Cir. 1997); Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996). Thus, this Court has drawn freely from those facts.

[3] The majority of facts asserted, while interesting from a historical perspective, are not material to the present lawsuit. The material issues in this case are those set out in New Mexico's Uniform Act, NMSA 1978, 39-4B-1 to 39-4B-9, and little else. For example, Lloyd's states as an undisputed fact, "As with any insurance regulator, one of the fundamental objectives of The Lloyd's regime is to ensure that policy holders are paid in

5

background statements, those disputes do not go to material issues as contemplated by New Mexico's Uniform Act.

The Society of Lloyd's, also called Lloyd's of London, is a centuries-old British institution. Through a succession of Parliamentary acts and special protection from the British Crown (The Lloyd's Acts, 1871-1982), the British Parliament authorized Lloyd's to regulate English insurance markets. Society of Lloyd's v. Turner, 2002 WL 1901433, ---F.3d--- (5th Cir. July 25, 2002). Pursuant to these parliamentary acts, Lloyd's "oversees and regulates the competition (or underwriting business in the insurance market[.]" Lipcon v. Underwriters at Lloyd's London, 148 F.3d 1285, 1288 (11th Cir. 1998).

Lloyd's neither underwrites risks nor issues insurance policies. Rather, underwriting syndicates vie for the insurance business. Each syndicate is controlled by a managing agent who is

---

respect of valid claims." Defendants assert they must dispute this statement because, "It is without any disclosure of the underlying facts and additional discovery is warranted," and "If Lloyd's 'fundamental objectives' are, in fact, material issues of fact, discovery is necessary to determine how other fundamental objectives are identified or balanced." (Defendants' Response, pp. 8 and 9). Yet, the fundamental objectives of Lloyd's or whether it fulfilled those objectives by paying valid claims has nothing to do with this lawsuit.

Similarly, in paragraph 4 of Lloyd's undisputed facts, it states, "The only insurers in the Lloyd's market are underwriting members of Lloyd's who are known as names." While it would appear that this statement is not subject to dispute given the numerous court decisions that are in accord, Defendants state, "Lloyd's membership is secret and information available to the New Mexico "Names" indicates the possibility that among Lloyd's members are members of Parliament voting on legislation to favor Lloyd's at the expense of outside names." (Defendants' Response, p. 9).

Again, whether Names are the only insurers, or whether members of Parliament are Names is immaterial. There are numerous other disputes on non-material matters. For example, Lloyd's statement that, "Although underwriting in the Lloyd's market was historically a profitable venture, in the late 1980's and early 1990's, Names in the Lloyd's market incurred aggregate underwriting losses of £8 billion pounds (over $12 billion dollars)." (Defendants' Response, p. 9). Again, that same statement appears in numerous reported court decisions and in Defendants' own Time magazine article. It is not subject to dispute, but in reference to this statement, Defendants do, indeed, dispute it and state, "The profitability of Lloyd's is a disputed matter." (Defendants' Response, p. 9). But, whether or not Lloyd's was profitable is not important, as none of these factual disputes touches on material issues. These are all simply examples of the disputes. Indeed, while Defendants are unable to agree on most of the facts asserted by Lloyd's, those facts are not material.

6

responsible for the financial status of the syndicate. Lipcon v. Underwriters at Lloyd's, at 1288.

The undisputed evidence indicates that each of the Defendants was a "Name" of the Lloyd's market, and a member of one or more syndicates. Names are outside investors whose money provides capital for Lloyd's. By becoming a Name, an investor anticipates profit and accepts a certain amount of the premium paid to the syndicate for an insurance policy; the Name is also assigned a corresponding share of the insurance risk. A Name's profit is derived from the amount, if any, remaining from the premium and earned investment income from retained premiums after the Name pays his or her pro rata share of expenses and claims. *See* Factual Background, Society of Lloyd's v. Webb. A Name pledges money to underwrite the insurance policies issued by the Lloyd's syndicates. But unlike a limited partnership, the Name's liability on the pledge is unlimited.

This process was described in Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996).

> The underwriting capital for each syndicate is supplied by cash advanced by the Names, and excess losses--those that exceed the premiums paid-- are insured by the Names' commitment to pay losses from their personal assets "down to their last cufflinks." The integrity of the market is also assured by a Central Fund, created from assessments of Names . . . .

Id. at 926.

As a condition of Defendants' participation in the Lloyd's market and membership in the Society, Defendants were required to execute an agreement known as the "General Undertaking," which outlines the parties' rights and responsibilities. The General Undertaking included a choice of law and choice of forum provision which requires that all litigation between Lloyd's and the Names be conducted in the courts of England and be governed by English law.

7

It is undisputed that the Defendants participated in various syndicates which were comprised of a group of Names. The syndicates pooled the Names' resources to serve as reserves and allow the syndicates to underwrite risks and issue insurance policies. The syndicates specialized in various kinds of insurance, i.e., aircraft, marine, etc. The Names were not required to pay the full measure of the risk up front, but only a percentage, and then the syndicate utilized reinsurance as a way of spreading the syndicate's own risk.

Due to mounting asbestos and toxic tort claims as well as significant claims and losses due to national disasters, i.e., Hurricane Hugo, on risks issued by syndicates years before Defendants became Names, Lloyd's syndicate reserves were inadequate to handle the mounting claims and many Names defaulted on their underwriting obligations.

> As losses mounted, intro-market disputes arose. Names accused managing agents and underwriters of mismanagement in assessing risks and even fraud in assessing and disclosing the risks to Names choosing syndicates. A considerable number of Names also became unable or unwilling to satisfy their obligations and began to incur debts to the Central Fund, and the ensuing litigation made it difficult for the Central Fund to collect from non-paying Names. The integrity and viability of the entire Lloyd's market was thus called into doubt.

Allen v. Lloyd's of London, at 926.

Further, because many Names faced outstanding contingent liabilities for which they had been unable to obtain reinsurance, Lloyd's was facing catastrophic losses and significant questions about its continued viability. This dire situation, in turn, led to the de-stabilization of the insurance markets. The proposed resolution of the crisis was two-fold: solicit new members and adopt a reconstruction and renewal plan. Lloyd's solicited new Names to increase available capital. Defendants each became Names and investors, and executed the General Undertaking.

This process was described in Society of Lloyd's v. Turner.

> Prospective members are solicited and assisted in the process of joining by Member's agents, whose duties to the names are fiduciary in nature. Names must pass a means test to ensure their ability to meet their underwriting obligations, post security (typically, a letter of credit), and personally appear in London before a representative of the Council of Lloyd's to acknowledge their awareness of the various risks and requirements of membership, and in particular the fact that underwriting in the Lloyd's market subjects them to unlimited personal liability.

Id. at 2002 WL 1901433, at *1. Thereafter, the Defendants were poised to share profits and obligated to share the risks underwritten by the syndicates they joined. Moreover, to maintain viability of insurance markets and, indeed, the viability of the European economy, Lloyd's also implemented a reconstruction and renewal plan. One court described this plan as follows:

> Because the losses were widely spread throughout the various syndicates, Lloyd's developed a reorganization program in 1995-96 called Reconstruction and Renewal ("R&R"). This was a mandatory plan of reinsurance of all years of account prior to 1993 into one reinsurance company called Equitas Reinsurance Ltd. . . . .

Society of Lloyd's v. Webb, *supra*, at 636.

Under the oversight of the government of the United Kingdom, Lloyd's accumulated syndicate assets totaling £9.9 billion. However, the Equitas reinsurance premium needed by December 31, 1995 was £14.7 billion. To raise the difference so as to pay the reinsurance premium, Lloyd's assessed each Name a mandatory amount.

> The Equitas premium was mandatory and each Name was required to pay Equitas the amount shown on his statement. If, however, the Name signed the settlement agreement included in the R&R package, the Name would be awarded a credit, which would result in a reduction in the amount he paid in. This credit was from the Names' litigation recoveries impounded by Lloyd's and settlement proceeds attributable to the Names. To obtain the credit, the Name was

> required to grant Lloyd's a release. However, the Names were not given a reciprocal release and were not provided indemnity. Furthermore, if Equitas were to fail, the Names were still required to provide the additional funds necessary until all liabilities for the old policies were paid.

Society of Lloyd's v. Webb, *supra* at 636.

If a Name did not accept the settlement offer, the Name was required to pay the full amount of his or her outstanding underwriting obligations, including the Equitas premium, without discount.

A deadline was established for the Names to accept the settlement offer, and the vast majority did. However, the Defendants in this case declined to accept the settlement offer. The reinsurance of all Names' outstanding 1992 and prior liabilities by Equitas became effective September 4, 1996, and the full amount of the Equitas premium became due and payable for Names who rejected the settlement offer, including the Defendants.

In accord with the General Undertaking and regulations governing Lloyd's, the Names had previously authorized Lloyd's to appoint agents to act on the Names' behalf. The Defendants were assessed pro rata shares of the unpaid Equitas premiums. When the assessments were not paid in full, Equitas irrevocably assigned to Lloyd's the right to collect the unpaid Equitas premiums, including the right of Lloyd's to sue on its own behalf to recover the Equitas premiums from the Defendants.

In l996, so as to collect the assessments from these Defendants and other Names, Lloyd's brought a series of lawsuits against those who had not paid the Equitas premium in full, together with interest and costs. Each Defendant herein was sued. These lawsuits were initiated in the High Court of Justice, Queen's Bench Division, located in London, England. Each Defendant was served with process and each Defendant retained counsel. Each Defendant entered his or her own appearance, through counsel, and submitted to the High Court's *in personam* jurisdiction. Pursuant to the choice

of law provision in the General Undertaking, the parties agreed to apply English law to any dispute. Each Defendant filed an acknowledgment of the service of the writ of summons in May 1997, and each Defendant was represented before the High Court of Justice by the solicitor firm of Epstein Grower and Michael Freeman.

In the English actions, the Defendants had a full and fair opportunity to raise various defenses to their obligations to pay. Indeed, the Defendants challenged the English lawsuits, raising the very same objections they raise in this present lawsuit. The Defendants contended that Lloyd's lacked authority under the Lloyd's Act, 1871-1982, to require that the Names purchase reinsurance from Equitas. The Names argued that they were entitled to rescind their membership as a result of fraud in the inducement or fraud in underwriting. They argued that the books, ledgers and accounts on which they relied were false and deceptive and failed to disclose the syndicate's preexisting liabilities. The Names argued an entitlement to litigate claims of fraud in the inducement concerning membership or underwriting as a set-off to their obligation to pay; and, additionally, the Names argued that they were not bound by provisions of the Equitas Reinsurance contract.

The briefing and hearings in the English courts were spread over thirty-two days. Ultimately, the High Court of Justice held that Lloyd's had the right to recover the Equitas premium, and that right could not be delayed pending resolution of the Names' fraud claims. The High Court also authorized the Defendants and the other Names to proceed with fraud claims against Lloyd's under a "pay now, sue later" provision in the parties' agreements. Indeed, many other Names asserted fraud claims against Lloyd's in separate English lawsuits, but the Defendants in this case chose not to join

in any of those direct fraud lawsuits against Lloyd's.[4] Thus, while having been afforded a forum and opportunity to bring a fraud action, the Defendants declined to act.

It is undisputed that following the thirty-two days of proceedings and hearings, the High Court of Justice found in favor of Lloyd's and entered judgments against each of the Defendants on March 11, 1998. The Defendants appealed the judgment issued by the High Court of Justice. Those decisions were affirmed. Society of Lloyd's v. Lyon, Leighs & Wilkinson (Court of Appeal), and a three-judge panel of the United Kingdom Court of Appeal heard arguments on further appeals from the Names as to other defenses on June 15-19, 1998, and ultimately denied leave to appeal on July 31, 1998. Society of Lloyd's v. Fraser, 199 Lloyd's Rep. IT 156 (Eng. C.A. 1998). All appeals having been exhausted, the judgments against the Defendants were all final and enforceable.[5] Each judgment, with proper apostille, was submitted to this Court as part of Lloyd's motion for summary judgment.

It is undisputed that enforcement of these judgments in New Mexico will result in severe financial consequences for each Defendant and perhaps certain financial ruin.

## **Analysis**

The Court must first determine whether the money judgments issued by the High Court of

---

[4] Names filed suits against Lloyd's in many U.S. courts, claiming fraud in connection with methods used by Lloyd's to recruit new investors, Lloyd's placement of Names in the high-risk syndicates, and Lloyd's refusal to allow Names to resign. In each case, Lloyd's was successful in dismissing the claims based on the forum selection clause in the general undertaking which required that disputes be resolved in English courts under English law. *See, e.g.,* Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998); Richards v. Lloyd's of London, 135 F.3d 1289 (9th Cir. 1998); Haynsworth v. Lloyd's of London; Allen v. Lloyd's of London; Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir. 1993); Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir. 1993); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.3d 953 (10th Cir. 1992).

[5] In their answer to the complaint, Defendants admitted that to the best of their knowledge, the judgments may be final, conclusive and enforceable in England and that no appeal in England is pending.

Justice, Queen's Bench, and affirmed by the United Kingdom Court of Appeal are final, conclusive and enforceable. NMSA 1978 § 39-4B-3. The undisputed evidence demonstrates that the judgments were entered after extensive litigation. The Defendants lost in the English forum. They appealed from the judgments and again lost. They sought the equivalent of a further certiorari review and failed. The judgments are final and enforceable.

The Court must next determine if there are grounds for non-recognition of the foreign judgments. Under Section 5 of the Uniform Act, the Court may determine that a foreign judgment is not conclusive if a judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of the law. However, the Tenth Circuit already commented on this matter, "[T]he courts of England are fair and neutral forums." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992); *to same effect see* Haynsworth v. The Corporation, 121 F.3d 956, 967 (5th Cir. 1997).

So, too, other federal courts have concluded that English courts provide impartial tribunals and that their procedures comport with our own principles of due process. Judge Posner, writing for a unanimous court in Society of Lloyd's v. Ashenden, 233 F.3d 473 (7th Cir. 2000), referred to this exact High Court, and on the question of "fairness" stated, "the question is not open to doubt." Id. at 477. Judge Posner wrote:

> The judgments about which they [Names] complain were rendered by the Queen's Bench Division of England's High Court, which corresponds to our federal district courts; they were affirmed by the Court of Appeal, which corresponds to the federal courts of appeals; and the Appellate Committee of the House of Lords, which corresponds to the U.S. Supreme Court, denied the defendants' petition for review. Any suggestion that this system of courts "does not provide impartial tribunals or procedures compatible with the requirements of due process of law" borders on the risible. "[T]he

13

> courts of England are fair and neutral forums." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992); *to same effect see* Haynsworth v. The Corporation, *supra*, 121 F.3d at 967; Roby v. Corp. of Lloyd's *supra*, 996 F.2d at 1363. The origins of our concept of due process of law are English. Dent v. West Virginia, 129 U.S. 114, 123, 9 S. Ct. 231, 32 L. Ed. 623 (1889); Hurtado v. California, 110 U.S. 516, 528-32, 4 S. Ct. 111, 28 L. Ed. 232 (1884); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 465 (7th Cir. 1988); Keith Jurow, "Untimely Thoughts: A Reconsideration of the Origins of Due Process of Law," 19 Am. J. Legal Hist. 265 (1975), and the English courts, especially the Supreme Court of Judicature (composed of the High Court and the Court of Appeal) and the Appellate Committee of the House of Lords, the tribunals involved in the judgments challenged here, are highly regarded for impartiality, professionalism, and scrupulous regard for procedural rights. The English judicial "system . . . is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own.
>
> In re Hashim, 213 F.3d 1169, 1172 (9th Cir. 2000) quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp., 318 F. Supp. 161, 166 (E.D. Pa. 1970), *aff'd*, 453 F.2d 435 (3d Cir. 1971). "United States courts which have inherited major portions of their judicial traditions and procedure from the United Kingdom are hardly in a position to call the Queen's Bench a kangaroo court." British Midland Airways Ltd. v. International Travel, Inc., 497 F.2d 869, 871 (9th Cir. 1974).

With these authorities and with our own Circuit having found that the English courts provide impartial tribunals and procedures, this Court, too, finds no basis for non-recognition of the judgments under § 5A of New Mexico's Uniform Act.

Similarly, the Court cannot reject the judgment for lack of *in personam* jurisdiction. The evidence is undisputed that each Defendant was served with process, and each Defendant voluntarily entered his or her appearance before the English court through counsel. Thus, there was *in personam* jurisdiction before the Queen's Bench Division of the High Court. Nor can the Court decline recognition of the money judgment on the basis that the foreign court did not have jurisdiction over

14

the subject matter. It is undisputed that the Names agreed to a choice of law and choice of forum provision. The Defendants agreed that disputes would be litigated in England pursuant to English law. Under these circumstances, there exists no basis for non-recognition under §§ 39-4B-5(A)(1)(2) or (3).

New Mexico law allows a court to refuse recognition of a foreign judgment if a defendant did not receive notice of the proceedings in sufficient time to enable him or her to defend. This provision is not applicable here, as Defendants each received notice, secured the services of legal counsel, and fully participated in the extensive proceedings before both the trial and appellate courts. Thus, Defendants may not convincingly argue that they lacked notice or had insufficient time to defend.

Additionally, a New Mexico court may decline to recognize the foreign judgments if they were procured by fraud. Here, while the Defendants assert fraud, those allegations go to Lloyd's dealings with the Defendants, for example, Lloyd's solicitation of Defendants as new Names or Lloyd's failure to disclose material information to them. Those fraud allegations were considered and rejected by the High Court.

There is no allegation of fraud in the court proceedings or that the money judgments were fraudulently obtained. If this Court found fraud, it could decline to enforce the judgments. By way of example, this would require bribery of a judicial officer, suborning perjury or some allegations with respect to the integrity of the English court's process. However, no allegations of that kind are presented, and the undisputed record fails to support such claims.

Defendants argue that the cause of action on which the judgment is based is repugnant to the public policy of this state. This same argument, however, was recently rejected by the Fifth Circuit in Society of Lloyd's v. Turner, --- F.3d ---, 2002 WL 1901433 (5th Cir. July 25, 2002). There,

15

Names, similar to the Defendants here, alleged that the Uniform Act adopted in Texas, which is identical to New Mexico's Uniform Act, should not be applied because its application would be repugnant to Texas public policy. In rejecting the argument in that case, the Fifth Circuit indicated, "In conducting our analysis, we again begin with 'the plain language of the Texas Recognition Act' and note that it is 'the cause of action on which the judgment is based' which must be contrary to Texas public policy before non-recognition is allowed."

The Fifth Circuit was careful to draw a distinction between the *cause of action* on which the judgment is based and the *judgment* itself. "[T]he fact that a judgment offends Texas public policy does not, in and of itself, permit the district court to refuse recognition of that judgment." Id. *citing* Southwest Livestock & Trucking Co., Inc. v. Ramon, 169 F.3d 317, 321 (5th Cir. 1999); *see also* Norkan Lodge Co., Ltd. v. Gillum, 587 F. Supp. 1457, 1461 (N.D. Tex. 1984). In Southwest v. Livestock & Trucking Co., the cause of action before the foreign tribunal was the collection of a promissory note. In rejecting that judgment issued by the foreign tribunal, which was usurious under Texas law and therefore "repugnant," the circuit said that a collection action was not repugnant to the public policy of Texas under the Texas Recognition Act, even though the maximum judgment was usurious, because the *cause of action* that brought about the judgment was not against public policy." Southwest Livestock & Trucking Co., at 321.

Here, the cause of action that resulted in a money judgment against Defendants is not repugnant to New Mexico law. Indeed, it is a simple action to enforce an obligation. It is the kind of action that is routinely heard and considered in New Mexico state and federal courts.

The fact that the effect of this judgment will have devastating financial consequences on the Defendants does not make the underlying cause of action contrary to public policy. While reasonable

16

minds may disagree on the fairness of the English court's decision, no reasonable mind can disagree that the underlying cause of action, that is, a lawsuit to enforce a contract, is not repugnant to New Mexico law.

The other grounds available for non-recognition under New Mexico law are inapplicable. For example, if the money judgment conflicted with other final and conclusive judgments, or if the proceeding in a foreign court was contrary to a party's agreement concerning resolution of a dispute, or if the foreign court was a seriously inconvenient forum for the trial of the action, this Court could reject enforcement of the judgment. However, there is no evidence that would support non-recognition on those grounds.

## **Conclusion**

The Court concludes that there exist no grounds for non-recognition of this foreign judgment, and that the foreign judgment is final, conclusive and enforceable where issued. In accord with New Mexico law, this Court is compelled to recognize and enforce a judgment properly issued under the laws of England by a court whose tribunals and procedures are compatible with the requirements of due process. These foreign judgments were final, conclusive and enforceable between Lloyd's and the Defendants in England, and are, therefore, conclusive here between Lloyd's and each of the Defendants named.

Summary judgment is granted in favor of the Plaintiff Lloyd's.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEYS FOR PLAINTIFF:
Barry D. Williams, Esq.
John A. Bannerman, Esq.

ATTORNEYS FOR DEFENDANTS:
Patrick Joseph Rogers, Esq.
Theodore W. Grippo, Jr., Esq.